1  WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Clim-A-Tech Industries Incorporated, | No. CV-15-00873-PHX-GMS |
| Plaintiff/Counterdefendant, | **ORDER** |
| v. | |
| William A. Ebert, et al., | |
| Defendants/Counterclaimants. | |

Pending before this Court are the briefs addressing claim construction. (Docs. 90–91, 93–94). The Court held a *Markman* Hearing on February 23, 2018, at which the parties presented additional arguments. For the reasons set forth below, the Court makes the following constructions and interpretations of the meaning of the disputed claims.

## BACKGROUND

Defendant William Ebert patented a device to protect the edges of cathode plates used in copper refinement. US Patent RE46,212 E ('212) (Doc. 39-1). In the underlying lawsuit, Plaintiff Clim-A-Tech Industries seeks a declaratory judgment that it is not infringing on Mr. Ebert's patent.

A typical process for copper refinement requires submersion of steel cathode plates in a copper electrolyte solution. Because copper gathers irregularly on the edges of the cathode plates, refiners cover the edges of the cathode plates with a non-conductive frame. Due to a number of issues with the previous art, Mr. Ebert patented a process of placing the bevel-cut ends of edge protector strips next to each other in a molding jig,

then introducing a fluid plastic into the jig that molds over the bevel cut ends of the edge protectors at the two corners of the frame to form a unitary U-shaped edge protector frame.

The parties dispute the meaning of "mating engagement" and "juncture" in claims 1, 15, and 17 of the patent. The full text of Claim 1 of the '212 patent, with disputed phrases underlined, is as follows:

> 1. A U-shaped edge protector system for a cathode plate, comprising:
>
> a. a first side edge strip and a second side edge strip, each of said side edge strips having an upper end and a lower end, and, an inner, open side portion extending therebetween, said lower end having a bevel termination;
>
> b. a bottom edge strip having an [sic] first end with a bevel termination in <u>mating engagement</u> with said bevel termination of said first side edge strip forming a first <u>juncture</u>, and having a second end with a bevel termination in <u>mating engagement</u> with said bevel termination of said second side edge strip forming a second <u>juncture</u>, said bottom edge strip having an inner, open side portion extending between said first end and said second end;
>
> c. a first molded comer piece, said first corner piece being molded over said first <u>juncture</u>; and,
>
> d. a second molded comer piece, said second corner piece being molded over said second <u>juncture</u>, forming a unitary structure.

(Doc. 39-1 at 10).

The full text of Claim 15, with disputed phrases underlined, is as follows:

> 15. A method for making a U-shaped edge protector system for a cathode plate, comprising the steps of:
>
> a. providing a first side edge strip and a second side edge strip, each of said side edge strips having an upper end and a lower end, and an inner, open side portion extending therebetween, said lower end having a bevel termination;

b. providing a bottom edge strip having a first end with a bevel termination and a second end with a bevel termination;

c. maintaining said bevel termination of said first end of said bottom edge strip in mating engagement with said bevel termination of said first side edge strip, forming a first juncture;

d. molding a first corner piece over said first juncture;

e. maintaining said bevel termination of said second end of said bottom edge strip in mating engagement with said bevel termination of said second side edge strip, forming a second juncture; and,

f. molding a second corner piece over said second juncture.

(Doc. 39-1 at 11–12).

The full text of Claim 17, with disputed phrases underlined, is as follows:

17. A U-shaped edge protector system for a cathode plate, comprising:

a. a first side edge stip [sic] and a second side edge strip, each of said side edge strips having an upper end and a lower end, and an inner, open side portion extending therebetween, said lower end having a bevel termination;

b. a bottom edge strip having a first end with a bevel termination in mating engagement with said bevel termination of said first side edge strip forming a first juncture, such that said bevel termination of said first side edge strip and said bevel termination of said bottom edge strip are in parallel relation, and having a second end with a bevel termination in mating engagement with said bevel termination of said second side edge strip forming a second juncture, such that said bevel termination of said second side edge strip and said bevel termination of said bottom edge strip are in parallel relation, said bottom edge strip having an inner, open side portion extending between said first end and said second end;

c. a first molded corner piece, said first corner piece being molded over said first juncture; and,

d. a second molded corner piece, said second corner piece being molded over said second juncture, forming a unitary structure.

(Doc. 39-1 at 12).

## DISCUSSION

**I. Legal Standard**

A patent includes two basic components: (1) a written description of the invention, which is referred to as the "specification" of the patent, and (2) the patent claims. The claims of a patent define the scope of the invention to which the patentee is entitled. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). Claim construction is exclusively within the province of the Court. *Markman*, 517 U.S. at 372. If a disputed claim term has a plain and ordinary meaning such that it needs no clarification or explanation, the Court need not adopt a construction beyond that plain meaning. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

When construing a patent's claims, the words of a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Courts should consider claims as a whole and should consistently construe terms used in multiple claims. *Inverness Med. Switz. BmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

When construing the claims, the Court should look first and primarily to the intrinsic evidence of the patent, which includes the claims, specification, and prosecution history. *Id.* The claims can provide substantial guidance by showing how the disputed words are used in context. *Id.*

1 The specification is the primary basis for claim construction and the best source for understanding a technical term in the proper context. *Id.* at 1315. The specification may narrow the scope of a disputed claim term if the patentee has "demonstrate[d] intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012), (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). In ascertaining whether the patentee has disavowed the full scope of a claim, the Court must not read limitations from the specification into the claims. *Teleflex*, 299 F.3d at 1326 (citing *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)). In other words, the claims are not necessarily limited to the embodiments disclosed in the specification. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc).

In addition to the specification and the claims themselves, the Court should also consider the patent's prosecution history, although it can be less useful. *Id.* at 1317. "The purpose . . . is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted). The prosecution history may reveal that the patentee "has unequivocally disavowed a certain meaning to obtain [its] patent." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Thus, the Court examines both the specification and prosecution history to ascertain whether the patentee has disavowed some portion of the full and ordinary scope of a claim term.

Extrinsic evidence may also be used to assist the Court's claim construction. Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, learned treaties, and other patents. *Phillips*, 415 F.3d at 1317. Although extrinsic evidence can shed useful light, it is less significant than the intrinsic record. *Id.* Extrinsic evidence must not be used to vary or contradict claim terms. *Vitronics*, 90 F.3d at 1584.

## II. Construction of Disputed Terms

### A. "Mating engagement"

Plaintiff Clim-A-Tech argues that the Court should construe "mating engagement" as "direct contact," and Defendant Ebert argues that the Court should construe it as "reasonable proximity."

First, the Court considers the claims in the patent. The claims protect a U-shaped edge protector system where ends of protector strips are molded over to form a unitary structure. Concerning "mating engagement," the language in the claims specifically states that a "bevel termination in mating engagement with [another] bevel termination" forms a juncture. '212 Patent at 8:46–49. Nothing in the claims explicitly state that the terminations must be in direct contact to each other before the molding process.

Next, the Court considers the specification of the patent. Similar to the claims, the preferred embodiment describes that the "[b]evel termination [of the bottom edge strip] is adapted for mating engagement with bevel termination of the . . . side edge strip, forming a . . . juncture." *Id.* at 4:37–40. Here, the idea of mating engagement suggests that corresponding parts are adapted to each other, but not necessarily that the corresponding parts are in direct contact. Although the patent's figures show the end product with a single dotted line, this simply shows that the end product is a unitary structure, and not that the beveled ends were in direct contact prior to the molding process. Nothing in the embodiment explicitly states that the terminations must be in direct contact before the molding process forms a unitary structure. Additionally, Clim-A-Tech does not reference any specific language in the prosecution history that explicitly states that the patent requires the bevel terminations to be in direct contact with each other. Because the patent claims and specification are sufficient to resolve the contested language, the Court construes "mating engagement" without addressing extrinsic evidence.

Given the over-molding process at issue, direct contact between the beveled ends is not a necessity to create an effective unitary structure. Such direct contact is not described in the patent. Especially as it pertains to an over-molding process, the plain

meaning of the language "mating engagement" has a larger scope than "direct contact." Certainly had direct contact been deemed a part of the process described in the patent, it would have been simpler to use the word "contact" or "direct contact" rather than "mating engagement" which is and appears intended to be more-encompassing than merely direct contact.

In fact, at the February 23 *Markman* hearing, the Court asked Clim-A-Tech if a process that left one hundredth of an inch gap between beveled ends would be a process that would not be protected by Mr. Ebert's patent. Counsel for Clim-A-Tech recognized that the patent might still cover such a process.

Consequently, the patent language does not designate a limiting construction that the beveled terminations be in direct contact with each other. On the other hand, Mr. Ebert's proposed construction of "reasonable proximity" is too vague, especially considering the claims' requirement that the ends be close enough to be "molded over" to form a "unitary structure." '212 Patent at 8:56–59. Therefore, the Court construes "mating engagement" as "reasonable proximity sufficient to form an effective unitary structure."

### B. "Juncture"

Plaintiff Clim-A-Tech argues that the Court should construe "juncture" as "a mitered joint or a mitered corner," and Defendant Ebert argues that the Court should construe it as "corner." At the February 23 *Markman* hearing, counsel for Mr. Ebert acknowledged that the '212 patent consistently refers to beveled ends, and that Mr. Ebert distinguished his patent from prior art by its beveled ends. Counsel for Mr. Ebert subsequently conceded that the Court may construe "juncture" as a mitered corner having beveled ends. Counsel for Mr. Ebert also noted that beveled ends are used to create a miter.

Considering the consistent use of "bevel" in the patent claims, the distinction of beveled ends in the prosecution history, and Mr. Ebert's concessions at the *Markman* hearing, the Court therefore construes "juncture" as "a mitered corner having beveled

ends."

## CONCLUSION

For the foregoing reasons,

**IT IS HERBY ORDERED** that the claims are construed under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) as specified:

a. "mating engagement" is construed as "reasonable proximity sufficient to form an effective unitary structure," and

b. "juncture" is construed as "a mitered corner having beveled ends."

Dated this 7th day of March, 2018.

_____
Honorable G. Murray Snow
United States District Judge